**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID ROTHBERG, on behalf of himself and a class of all others similarly situated,<br><br>                              Plaintiff,<br><br>v.<br><br>BJ'S WHOLESALE CLUB HOLDINGS, INC.,<br><br><br>                              Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Rothberg ("Plaintiff"), individually and on behalf of himself and all others similarly situated, bring this class action lawsuit against Defendant BJ's Wholesale Club Holdings, Inc. ("BJ's" or "Defendant") based upon personal knowledge as to himself, the investigation of his counsel, and on information and belief as to all other matters.

## INTRODUCTION

1.      This is a class action lawsuit against Defendant regarding the manufacture, distribution, and sale of the Berkley Jensen "Non-Drowsy" Daytime over-the-counter cold and flu medicines that contain Dextromethorphan Hydrobromide ("the "Non-Drowsy Products").[1]

2.      The Non-Drowsy Products state prominently on the front of their product packaging that they are "Non-Drowsy" and "Daytime" products.

---

[1] The Non-Drowsy Products include the Berkley Jensen "Non-Drowsy" Daytime Cold & Flu Relief. Plaintiff reserves the right to amend this list if further investigation and/or discovery reveals that the list should be amended.



3.     By prominently labeling the products as "Non-Drowsy," Defendant led Plaintiff and other consumers to believe that the Non-Drowsy Products do not cause drowsiness, and that drowsiness is not a side effect of the products.

4.     Defendant also led Plaintiff and other consumers to believe that the Non-Drowsy Products are for use during the "Daytime" and intended to be used during waking hours.

5.     However, one of the active ingredients in the Non-Drowsy Products is Dextromethorphan Hydrobromide ("DM HBr"). While the average consumer may not be aware, drowsiness is a documented side effect of DM HBr at dosages recommended by Defendant in respect to the Non-Drowsy Products. Authorities such as the National Library of Medicine and Mayo Clinic list drowsiness as a side effect of this ingredient.[2]

6.     Plaintiff and Class members purchased the Non-Drowsy Products with the expectation that the products would not cause drowsiness and that they were intended to be used

---

[2] *Dextromethorphan*, MEDLINEPLUS, NIH: NATIONAL LIBRARY OF MEDICINE, https://medlineplus.gov/druginfo/meds/a682492.html (last visited July 22, 2022); *Dextromethorphan (Oral Route)*, MAYO CLINIC: DRUGS AND SUPPLEMENTS, https://www.mayoclinic.org/drugs-supplements/dextromethorphan-oral-route/side-effects/drg-20068661?p=1 (last visited July 26, 2022).

during waking hours. Because Defendant sold products to consumers that cause drowsiness, Plaintiff and the Classes were deprived of the benefit of their bargain.

7.      Accordingly, Plaintiff brings this action on behalf of himself and the Class for equitable relief and to recover damages and restitution for: (i) breach of express warranty; (ii) violations of New York General Business Law § 349; (iii) violations of New York General Business Law § 350; (iv) unjust enrichment; (v) negligent misrepresentation; and (vi) intentional misrepresentation.

## PARTIES

8      Plaintiff David Rothberg is a resident and citizen of the state of New York. In late 2020 at a BJ's located at 1000 Old Nichols Rd. Islandia, NY 11749, Plaintiff Rothberg purchased a Non-Drowsy Product because of the representations that the Non-Drowsy Product was "non drowsy" and for "daytime" use. When purchasing the Non-Drowsy Product, Plaintiff Rothberg reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the "Non-Drowsy" "Daytime" product would not cause drowsiness and could be used during the day. Plaintiff Rothberg relied on these representations and warranties in deciding to purchase the Non-Drowsy Product and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Non-Drowsy Product if he had known that it would cause drowsiness. When Plaintiff Rothberg took the medication as directed by Defendant, he became unexpectedly drowsy.  Plaintiff Rothberg was not on any other medication that would have caused drowsiness, and there was no other potential cause for this drowsiness, aside from the ingredients in the medication.  Plaintiff Rothberg would purchase the Non-Drowsy Products again if they were actually "Non-Drowsy" (*i.e.*, if the product was sold as advertised). Plaintiff Rothberg, however, faces an imminent threat of harm because he will not be

3

able to rely on the labels in the future, and thus will not be able to purchase the products.

9       Defendant BJ's Wholesale Club Holdings, Inc. is a Delaware company with its principal place of business in Westborough, Massachusetts. At all relevant times hereto, Defendant was engaged in manufacturing, marketing, distributing, and advertising the Non-Drowsy Products throughout the United States. Defendant created and/or authorized the false and misleading advertising and labeling of the Non-Drowsy Products.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than one hundred (100) Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from the Defendant.

11.     This Court has personal jurisdiction over Defendant because Defendant sold the Non-Drowsy Products to consumers in New York, including to Plaintiff. Defendant derives substantial revenue from sales of its products in this State, with knowledge that its products are being marketed and sold for use in this State.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of Defendant's conduct giving rise to the claims occurred in this District, including Plaintiff's purchase of the Non-Drowsy Product at a BJ's retail store within this District.

## FACTUAL ALLEGATIONS

### A.      Defendant Manufactures, Distributes, Markets, and Sells the Non-Drowsy Products

13.     Defendant manufactures, distributes, markets, and sells the Non-Drowsy Products.

14.     Each of the Non-Drowsy Products prominently state on its label that the product is "Non-Drowsy" and for "Daytime" use.

4

15.     The Non-Drowsy Products are sold in combo packs with "Night" products. For example, below is an image of the Berkley & Jensen Daytime/Nighttime Cold & Flu Relief combo pack which includes "Daytime" and "Night" formulations.



16.     The "Daytime" product includes the "Non-Drowsy" representation, while the "Nighttime" product is silent to Non-Drowsy characteristics.

17.     Both the "Daytime" and "Night" products contain DM HBr, the ingredient in the Non-Drowsy Products that causes drowsiness.

18.     The "Non-Drowsy" and "Daytime" representations are materially the same across the Non-Drowsy Products.

19.     Based on the prominent "Non-Drowsy" and "Daytime" representations included on the front of each product, a reasonable consumer would believe that the products do not cause drowsiness and that drowsiness is not a side effect of the product.

**B.      Defendant's False and Misleading Advertising Campaign**

20.     One of the active ingredients in the Non-Drowsy Products is DM HBr.

21.     Drowsiness is a well-documented side effect of DM HBr.

22.     For example, the Mayo Clinic and the National Library of Medicine list drowsiness as a side-effect of the ingredient.[3]

23.     Manufacturers and distributors know that DM HBr causes drowsiness as their safety data sheets ("SDS") explicitly state that DM HBr causes and may cause drowsiness.

24.     According to Pfizer's safety datasheet for their Robitussin cough medicine, "Common adverse reactions associated with the clinical use of dextromethorphan hydrobromide include drowsiness, dizziness, and nausea and vomiting."[4]

25.     Santa Cruz Biotechnology Inc. lists acute health effects on their SDS following the consumption of DM HBr such as "Drowsiness, dizziness, excitation, mental confusion, and gastro-intestinal disturbances have been described following dextromethorphan. Administration."[5]

26.     Peer-reviewed studies have also confirmed that drowsiness is a side effect of DM HBr at the recommended dosages.  For example, one study found that "[s]omnolence is a common side effect of centrally acting antitussive drugs" like DM HBr, and that 10.4% of users of products containing DM HBr develop drowsiness within three days of starting treatment with DM HBr cough medicine.  [6, 7] The "cases of intense somnolence" were "related only to dextromethorphan" and not to the other drug studied.  And the patients in this clinical study were given an even smaller

[3]*Dextromethorphan*, MEDLINEPLUS, NIH: NATIONAL LIBRARY OF MEDICINE, https://medlineplus.gov/druginfo/meds/a682492.html (last visited July 26, 2022); *Dextromethorphan (Oral Route)*, MAYO CLINIC: DRUGS AND SUPPLEMENTS, https://www.mayoclinic.org/drugs-supplements/dextromethorphan-oral-route/side-effects/drg-20068661?p=1 (last visited July 26, 2022).
[4]*Pfizer, Safety Data Sheet*: Robitussin Cough and Chest Congestion DM (Better Tasting) https://imgcdn.mckesson.com/CumulusWeb/Click_and_learn/SDS_9PFIZ_ROBITUSSIN_DM_SYRP_ADLT_COUGH_CHEST_HONEY_4OZ.pdf (last visited July 26, 2022).
[5] *Dextromethorphan Hydrobromide, Material Safety Data Sheet*, https://datasheets.scbt.com/sc-204716.pdf (last visited July 26, 2022).
[6] E. Catena and L. Daffonchio, *Efficacy and Tolerability of Levodropropizine in Adult Patients with Non-productive Cough, Comparison with Dextromethorphan*, 10 PULMONARY PHARMACOLOGY & THERAPEUTICS 89-96 (1997).
[7] The study reports this side effect as "somnolence." Somnolence means "the quality or state of being drowsy." MERRIAM WEBSTER DICTIONARY, https://www.merriamwebster.com/dictionary/somnolence (last visited July 26, 2022).

dosage of DM HBr (15 mg three times a day) than the recommended dose found in Non- Drowsy products.[8]

27.     In other words, sedation is a well-known adverse event of this ingredient.[9]

28.     In fact, the Federal Aviation Administration prohibits pilots from flying after taking medicines that contain dextromethorphan. The document titled, "What Over-the-Counter (OTC) medications can I take and still be safe to fly" lists DayQuil as a "No Go" product because it contains dextromethorphan.[10] The Non-Drowsy Products and DayQuil both contain this ingredient.

29.     The Non-Drowsy Products do not qualify the voluntary deceptive statements "Non-Drowsy" and "Daytime" with a disclaimer or qualification anywhere on the packaging; in other words, they do not disclose anywhere on the packaging that even though the Non-Drowsy Products affirmatively claim to be "Non-Drowsy" and "Day," they actually do or can cause drowsiness, or that drowsiness is a side effect.  Accordingly, there is nothing on the packaging that could possibly cure or ameliorate the deception caused by the affirmative "Non-Drowsy" and "Daytime" representations.[11]

30.     As such, Defendant's advertising campaign is false and misleading.

---

[8] For example, the Berkley Jensen Daytime Multi-Symptom Cold & Flu Relief contains 10 mg of DM HBr per softgel and the recommended dosage is 2 softgels (20 mg of DM HBr) every 4 hours.

[9] *See* Martin, E., Narjoz, C., Decleves, X., Labat, L., Lambert, C., Loriot, M. A., & Pickering, G. (2019). *Dextromethorphan analgesia in a human experimental model of hyperalgesia.* ANESTHESIOLOGY, *131*(2), 356-368; *see also* Siu, A. and Drachtman, R. (2007), *Dextromethorphan: A Review of N-methyl-d-aspartate Receptor Antagonist in the Management of Pain.* WILEY ONLINE LIBRARY: CNS DRUG REVIEWS, 13: 96-106. https://doi.org/10.1111/j.1527-3458.2007.00006.x ("DM is used clinically in the form of salt, dextromethorphan hydrobromide…The majority of DM's adverse effects occur at the level of the CNS. Neurologic toxicity associated with DM includes dystonia, fatigue, drowsiness, and dizziness.") (last visited July 26, 2022).

[10] *What Over-the-Counter (OTC) medications can I take and still be safe to fly,* FEDERAL AVIATION ADMINISTRATION, https://www.faa.gov/licenses_certificates/medical_certification/media/OTCMedicationsforPilots.pdf  (last visited July 26, 2022).

[11] To be clear, Plaintiff does not contend that Defendant has a duty to warn that their products cause drowsiness in the absence of any affirmative misrepresentation; they contend that it is deceptive to affirmatively label the Non-Drowsy Products "Non-Drowsy" and "Daytime."

31.     The Food and Drug Administration ("FDA") prohibits labeling drugs with "false or misleading" statements. 21 C.F.R. § 201.6. It is misleading to label a product "Non-Drowsy" when it does cause drowsiness, or if drowsiness is a known side effect of one of its active ingredients.

32.     This case is about Defendant's affirmative, "Non-Drowsy" representation on the Non-Drowsy Product labels.  No FDA regulation allows antitussives containing DM HBr to be labelled "Non-Drowsy" and the FDA has never considered whether this claim is false and misleading (nor would the FDA ever approve such a claim, because it is in fact false and misleading).

33.     Based on the fact that Defendant labelled the Non-Drowsy Products as "Non-Drowsy," a reasonable consumer would expect that those products do not cause drowsiness. Similarly, a reasonable consumer would expect that drowsiness is not a side effect of the products. Indeed, according to Consumer Reports, "'Non-drowsy' is code for antihistamines and other medications that don't make you sleepy."[12]  This is the plain meaning of "non-drowsy," which means "not causing or accompanied by drowsiness."

34.     While the Federal Regulations relating to the labelling of antitussive drug products do not require products with DM HBr to include an affirmative "drowsiness" warning, *see generally*, 21 C.F.R. § 341.74, Defendant could have simply omitted the false and misleading "Non-Drowsy" representations from the product labels.

35.      Other drug makers do not falsely claim that products that include DM HBr are "non-drowsy."  For example, Coricidin is a cold symptom relief product for people with high blood

---

[12] *How to read over the counter (OTC) drug labels*, CONSUMER REPORTS, https://www.consumerreports.org/cro/2014/04/how-to-read-over-the-counter-drug-labels/index.htm (last visited July 26, 2022).

pressure. Coricidin is manufactured, sold, and advertised by Bayer. This product contains DM HBr and omits false representations by not labeling the product as "Non-Drowsy."



36.      Or, if Defendant wanted to differentiate its Daytime products from its Nighttime products, it could have indicated on the product label that the Daytime products would cause *less* drowsiness than the Nighttime products. For example, the below Dramamine product is advertised as a "less drowsy" formula.



37.     Whether or not an over-the-counter drug causes drowsiness is material to a reasonable customer.  In certain situations, consumers prefer over-the-counter drugs that will not make them drowsy to products that may make them drowsy.  For example, all else equal, a reasonable consumer would prefer to take a drug that does not cause drowsiness to one that does cause drowsiness during the day (or any periods of time when they plan to be awake).  As a second example, if a consumer is planning to engage in activities that require them to be alert, or during which they would prefer to be alert, that consumer would prefer to take a drug that does not cause drowsiness to one that does.  Indeed, in many situations, taking a drug that does or can cause drowsiness can be dangerous.  For example, taking a drug that causes drowsiness while driving is dangerous.

38.     Because Defendant makes and sells the Non-Drowsy Products, Defendant researched the known and common side effects of DM HBr.  This is diligence that a large company like Defendant would do when selling a drug.  As a result, Defendant knew that DM HBr causes drowsiness.  Furthermore, Defendant controls its labeling, knowingly put on the "Non-Drowsy" and "Daytime" representations, and knows the plain meaning of "Non-Drowsy."  Finally, it is standard practice in the industry to test labeling with consumers, and Defendant's testing would confirm that "Non-Drowsy" and "Daytime" representations are misleading.  For these reasons, Defendant knew that its labeling was false and misleading, or was reckless or willfully blind to this fact.  And as alleged above, Defendant intended that consumers would rely on the "Non-Drowsy" and "Daytime" labeling, so that consumers would purchase more products and pay a price premium.

39.     Defendant's false statements increased the demand for its Non-Drowsy Products and allowed Defendant to charge a price premium.  As explained above, consumers specifically

value the "Non-Drowsy" claim because consumers demand cough medicine that will not make them drowsy (e.g., during the day, at work or while driving).  As a result, Defendant was able to charge more for these products than it would have been able to had the labeling been truthful. Accordingly, as a direct result of Defendant's false statements, Defendant was able to charge a price premium for these products.  As purchasers, Plaintiff and each class member paid this price premium and sustained economic injury.

40.     In addition, because the Non-Drowsy Products actually do cause drowsiness, Plaintiff and each class member did not get what they paid for: a medicine that does not cause drowsiness.  Instead, they received something that is worth less: a medicine that does cause drowsiness.  Plaintiff and each class member sustained an economic injury for this additional reason, *i.e.*, they received something worth less than the price they paid for it.

41.     Moreover, the Non-Drowsy Products are sold specifically for use in situations where it is not acceptable for consumers to become drowsy (e.g., while driving, working, or supervising children).  As a result, the products that Plaintiff and each class member did receive in exchange for the price they paid—Non-Drowsy Products that cause drowsiness—were not suitable for, and were thus worthless for, their intended purpose.  The economic injury Plaintiff and each class member sustained consists of the entire purchase price of the products, because what they received was worthless for its intended use.

42.     Defendant intended that consumers would rely on the "Non-Drowsy" and "Daytime" labeling so that consumers would purchase more products, pay a price premium, and buy them as alternatives to the "Night" products. The product labels do not warn consumers that the products cause drowsiness, may cause drowsiness, or you may get drowsy from the usage of such products thereby creating an unreasonable risk of harm as a result of the affirmative deceptive

"Non-Drowsy" and "Daytime" statements, which are not qualified anywhere on the packaging.

**C.     Consumers Have Been Harmed By Defendant's False Representations**

43.     Defendant knew, or should have known, that Defendant's Non-Drowsy Products are misbranded because they contain DM HBr which causes drowsiness in consumers.

44.     Defendant knew, or should have known, that Defendant misrepresented material facts concerning the "Non-Drowsy" and "Daytime" representations when in fact the Non-Drowsy Products contained an ingredient that causes drowsiness.

45.     Defendant knew, or should have known, the representations and statements through the product labeling prescribes dangerous uses.

46.     Plaintiff would not have purchased the Non-Drowsy Products, or would have paid less for them, had the Non-Drowsy Product that Plaintiff purchased been truthfully and accurately labeled.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of the following Classes:

> All persons who purchased one or more of Defendant's Non-Drowsy Products in the United States for personal/household use within any applicable limitations period (the "Nationwide Class").

48.     Plaintiff also brings this action individually and on behalf of the following New York subclass:

> All persons who purchased one or more of Defendant's Non-Drowsy Products in the state of New York for personal/household use within any applicable limitations (the "New York Subclass").

49.     Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any

entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of Non-Drowsy Products.

50. Numerosity (Rule 23(a)(1)): The exact number of members of the Class is unknown and currently unavailable to Plaintiff, but joinder of individual members herein is impractical. The Class is likely comprised of thousands of consumers. The precise number of Class members, and their addresses, is unknown to Plaintiff at this time, but can be ascertained from Defendant's records and/or retailer records. The members of the Class may be notified of the pendency of this action by mail or email, Internet postings and/or publications, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

51. Predominant Common Questions (Rule 23(a)(2) and (b)(3)): The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. The common and legal questions include, but are not limited to, the following:

    a. Whether the Non-Drowsy Products cause drowsiness;

    b. Whether Defendant breached express warranties;

    c. Whether Defendant's labelling of the Non-Drowsy Products as "Non-Drowsy" and "Daytime" is false, misleading, and/or deceptive;

    d. Whether Defendant violated the state consumer protection statutes alleged herein;

    e. Whether Defendant was unjustly enriched; and

    f. The nature of relief, including damages and equitable relief, to which Plaintiff and members of the Class are entitled.

52.     Typicality of Claims (Rule 23(a)(3)): Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other Class Members, purchased the Non-Drowsy Products, suffered damages as a result of that purchase, and seek the same relief as the proposed Class Members.

53.     Adequacy of Representation (Rule 23(a)(4)): Plaintiff adequately represents the Class because his interests do not conflict with the interests of the members of the Class, and they has retained counsel competent and experienced in complex class action and consumer litigation. Plaintiff and their counsel will fairly and adequately protect the interest of the members of the Class.

54.     Superiority (Rule 23(b)(3)): A class action is superior to other available means of adjudication for this controversy. It would be impracticable for members of the Class to individually litigate their own claims against Defendant because the damages suffered by Plaintiff and the members of the Class are relatively small compared to the cost of individually litigating their claims. Individual litigation would create the potential for inconsistent judgments and delay and expenses to the court system. A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

55.     Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)): In the alternative, this action may properly be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for the Defendant; or the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications,

or substantially impair or impede their ability to protect their interests; or Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I

**BREACH OF EXPRESS WARRANTY**
**(On behalf of Plaintiff and the Nationwide Class (or alternatively, the New York Subclass) against Defendant)**

56.     Plaintiff hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

57.     Defendant marketed and sold its Non-Drowsy Products in the stream of commerce with the intent that its Non-Drowsy Products would be purchased by Plaintiff and the Classes.

58.     In connection with the sale of the Non-Drowsy Products, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller issued written warranties by representing that the Non-Drowsy Products were "Non-Drowsy" and were "Daytime" products. These were affirmations of fact about the products (i.e., a description of the effects) and a promise relating to the goods.

59.     The above affirmations of fact were not couched as "belief" or "opinion" and were not "generalized statements of quality not capable of proof or disproof."

60.     These affirmations of fact became part of the basis for the bargain and were material to Plaintiff and Class members' transactions.

61.     In fact, the Non-Drowsy Products do not conform to the above referenced representations because, as alleged in detail above, they cause drowsiness. Thus, the warranty was breached.

62.     As a direct and proximate cause of Defendant's breach of express warranty,

Plaintiff and the Class members have been injured and harmed because they would not have purchased the products had they known that the Non-Drowsy Products cause drowsiness; or (2) they overpaid for the Non-Drowsy Products because they are sold at a premium due to the warranties.

63.     On June 7, 2022 prior to filing this action, Defendant was served with a pre-suit notice letter pursuant to U.C.C. § 2-607. Plaintiff did not receive a response to his demand letter.

## COUNT II

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349
### (On behalf of Plaintiff and the New York Subclass)

64.     Plaintiff hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

65.     New York's General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]" N.Y. GEN. BUS. LAW § 349.

66.     In its sale of goods throughout the State of New York, Defendant conducts business and trade within the meaning and intendment of New York's General Business Law § 349.

67.     Defendant's foregoing acts and practices, including its advertising, were directed at consumers.

68.     Defendant's false representations as alleged herein were material because they were likely to deceive reasonable consumers.

69.     In the course of its trade, Defendant violated New York's General Business Law § 349 by misrepresenting material facts on the labels of its Non-Drowsy Products relating to the appropriate use and "Non-Drowsy" nature of the products. Defendant falsely advertised the Non-

Drowsy Products by using false and misleading statements to promote the sale of the Non-Drowsy Products, as described above, including representing that the Non-Drowsy Products were "Non-Drowsy" and were for "Daytime" use.

70.    Specifically, by misrepresenting material facts regarding the Non-Drowsy Products, Defendant engaged in one or more unfair or deceptive business practices prohibited by New York Business Law §349.

71.    Plaintiff and the New York Subclass members were harmed by Defendant's conduct because Plaintiff and New York Subclass members would not have purchased the Non-Drowsy Products but for Defendant's misrepresentations relating to the Non-Drowsy nature of the products at issue.  Accordingly, Plaintiff and the New York Subclass members received less than what they bargained and paid for.

72.    Defendant's false, misleading, and deceptive representations have resulted in consumer injury or harm to the public interest.

73.    A reasonable consumer would consider Defendant's representations relating to the appropriate use and "Non-Drowsy" nature of the products as important in deciding whether to buy the Non-Drowsy Products.

74.    Defendant's misrepresentations were a substantial factor and proximate cause in causing damages and losses to Plaintiff.

75.    As a direct and proximate result of these acts, consumers have been and are being harmed. Plaintiff and members of the New York Subclass have suffered injury and actual out-of-pocket losses because: (a) Plaintiff and members of the New York Subclass would not have purchased the Non-Drowsy Products if they had known the true facts regarding the products; (b) Plaintiff and members of the New York Subclass paid a price premium due to the

misrepresentations about the products; and (c) the Non-Drowsy Products did not have the promised quality, effectiveness, or value.

76.     On behalf of himself and other members of the New York Subclass, Plaintiff brings this action to enjoin Defendant's unlawful and deceptive acts or practices and seeks to recover their actual damages or fifty dollars, whichever is greater, per violation, three times actual damages, and reasonable attorneys' fees.

## COUNT III

### VIOLATION OF NEW YORK GENERAL BUSINESS LAWS § 350
### (On behalf of Plaintiff and the New York Subclass)

77.     Plaintiff hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

78.     New York's General Business Law §350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service[.]" N.Y. GEN. BUS. LAW § 350.

79.     Defendant's actions occurred in the conduct of business, trade or commerce.

80.     Defendant's foregoing acts and practices, including its advertising, were directed at consumers.

81.     Defendant's false representations as alleged herein were material because they were likely to deceive reasonable consumers.

82.     In the course of its trade, Defendant violated New York's General Business Law § 350 by misrepresenting material facts on the labels for its Non-Drowsy Products relating to the appropriate use and "Non-Drowsy" nature of the products. Defendant falsely advertised the Non-Drowsy Products by using false and misleading statements to promote the sale of the Non-Drowsy Products, as described above, including but not limited to, representing that the Non-Drowsy

18

Products were "Non-drowsy" and were for "Daytime" use.

83.     Specifically, by misrepresenting material facts regarding the Non-Drowsy Products, Defendant engaged in one or more unfair or deceptive business practices prohibited by New York Business Law § 350.

84.     A reasonable consumer would consider Defendant's representations relating to the appropriate use and "non-drowsy" nature of the products as important in deciding whether to buy the Non-Drowsy Products.

85.     Plaintiff and the New York Subclass members were injured by Defendant's conduct because they would not have purchased the Non-Drowsy Products but for Defendant's misrepresentations concerning the Non-Drowsy nature of the products.  Accordingly, Plaintiff and the New York Subclass members received less than what they bargained and paid for.

86.     Defendant's misrepresentations were a substantial factor and proximate cause in causing damages and losses to Plaintiff.

87.     As a direct and proximate result of these acts, consumers have been and are being harmed. Plaintiff and members of the New York Subclass have suffered injury and actual out-of-pocket losses because: (a) Plaintiff and members of the New York Subclass would not have purchased the Non-Drowsy Products if they had known the true facts regarding the products; (b) Plaintiff and members of the New York Subclass paid a price premium due to the misrepresentations about the products; and (c) the Non-Drowsy Products did not have the promised quality, effectiveness, or value.

88.     On behalf of himself and other members of the New York Subclass, Plaintiff seeks to recover actual damages or five hundred dollars, whichever is greater for each violation, three times actual damages, and reasonable attorneys' fees.

**COUNT IV**

**UNJUST ENRICHMENT**
**(On behalf of the Plaintiff and the Nationwide Class)**

89.     Plaintiff hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

90.     Plaintiff and Class members conferred benefits upon Defendant. Plaintiff and Class members paid money for Defendant's Non-Drowsy Products that he would not have paid had he known that the products cause drowsiness.

91.     Defendant has unjustly retained the benefits conferred upon by Plaintiff and Class members.

92.     Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits. Specifically, Defendant retained those benefits even though Defendant's Non-Drowsy Products cause drowsiness. If Plaintiff and Class members had known the true nature of Defendant's Non-Drowsy Products, they would not have purchased the products. Plaintiff and Class members are therefore entitled to disgorgement and/or restitution as prayed for hereunder.

93.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the Class for its unjust enrichment, as ordered by the Court.

**COUNT V**

**NEGLIGENT MISREPRESENTATION**
**(On behalf of the Plaintiff and the Nationwide Class or, alternatively, the New York Subclass)**

94.     Plaintiff hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

95.     Plaintiff brings this claim against Defendant on behalf of himself and the proposed Class.

96.     Defendant has made material misrepresentations of fact concerning the nature of, and ingredients in, the Non-Drowsy Products to Plaintiff and the Class.

97.     Defendant has and had no reasonable basis for believing that their misrepresentations were true.

98.     Defendant knew, or should have known, that Plaintiff and the members of the Class would rely on the false representations about the nature of, and ingredients in, the Non-Drowsy Products.

99.     Defendant's false representations about the ingredients of the Non-Drowsy Products are objectively material to reasonable consumers, and therefore reliance upon such representations may be presumed as a matter of law.

100.    Plaintiff and members of the Class have read and reasonably relied to their detriment on Defendant's false and misleading representations, which caused them to purchase the Non-Drowsy Products.

101.    As a proximate result of Defendant's negligent misrepresentations, Plaintiff and each member of the Class has been damaged in the amount of the purchase price of the Non-Drowsy Products and any consequential damages resulting from their purchases, including sales tax.

## COUNT VI

## INTENTIONAL MISREPRESENTATION
**(On behalf of the Plaintiff and the Class or, alternatively, the New York Subclass)**

102.    Plaintiff hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

103.    Defendant has intentionally made material misrepresentations of fact concerning the nature of, and ingredients in, the Non-Drowsy Products to Plaintiff and the Class.

104.    Defendant knew that the intentional misrepresentations herein were false at the time they were made.

105.    Defendant intended that Plaintiff and members of the Class would rely on the false representations and purchase Defendant's Non-Drowsy Products.

106.    Defendant's false representations are objectively material to reasonable consumers and therefore reliance upon such representations may be presumed as a matter of law.

107.    Plaintiff and members of the Class reasonably relied to their detriment on Defendant's intentional misrepresentations.

108.    Defendant's intentional misrepresentations were a substantial factor in causing Plaintiff and members of the Class to purchase the Non-Drowsy Products.

109.    Defendant has acted with malice by engaging in conduct that was and is intended to cause injury to Plaintiff and the members of the Class.

110.    Defendant has committed fraud through their intentional misrepresentations, deceit, and/or concealment of material facts known to Defendant with the intent to cause injury to the purchasers of the Non-Drowsy Products.

111.    As a proximate result of Defendant's intentional misrepresentations, Plaintiff and the members of the Class suffered an ascertainable loss and are entitled to relief and compensatory and punitive damages, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the proposed Classes, pray for relief and judgment against Defendant as follows:

      a.      Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representative of the Class, and designating Plaintiff's counsel as Class Counsel;

      b.      Awarding Plaintiff and the Classes compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

      c.      Awarding Plaintiff and the Classes appropriate relief, including but not limited to actual damages;

      d.      For declaratory and equitable relief, including restitution and disgorgement;

      e.      For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

      f.      Awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

      g.      Awarding Plaintiff and the Classes reasonable attorneys' fees and costs as allowable by law;

      h.      Awarding pre-judgment and post-judgment interest;

      i.      For punitive damages; and

      j.      Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: August 1, 2022                    Respectfully submitted,

By: s/ *Mark S. Reich*
Mark S. Reich
Courtney E. Maccarone
**LEVI & KORSINSKY, LLP**
55 Broadway, 10th Floor
New York, NY 10006
Phone: 212-363-7500
Email: mreich@zlk.com
Email: cmaccarone@zlk.com

Nick Suciu III (*pro hac vice* to be filed)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Phone: 313-303-3472
Email: nsuciu@milberg.com

Gary M. Klinger (*pro hac vice* to be filed)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
Email: gklinger@milberg.com

*Counsel for Plaintiff*